Our second case this morning is City of Clinton v. Illinois State Labor Relations Board. That's case number 4130304. For the appellant, we have Nick Setwinski. I got lucky. For the appellee, it looks like you divided your time 10 minutes apiece. For the appellant, it looks like you divided your time 10 minutes apiece. And Melissa Arbok. For asking. Correct? Alright, you may proceed. Good morning. I appreciate the opportunity to be here. Counsel, I'm sorry to... I want to thank all of you for moving your case up an hour. I know we had made that request to the clerk's office yesterday. And we appreciate you acquiescing to that request. And on behalf of Melissa, I would like to say thank you very much. We're driving back. So based on that, I'll be very brief. And hopefully it won't take up to 20 minutes. I stand behind what is in the brief. So there's no sense in rehashing in front of you what's in the brief. I would like to highlight just two things. First of all, with regards to the argument that the Labor Relations Board erred in their finding of going ahead and interpreting a provision of the grievance settlement agreement as opposed to interpreting whether or not we had one. There was some talk about the hospital not being aware of a federal investigation on or about April 1, 2011. However, in July, we filed an answer to the unfair labor practice complaint. And in that answer, we stated, however, on or about April 1, 2011, while the state charges were dismissed by the State Circuit Court, said employee remains the subject of continuing criminal investigation by the Federal Drug Enforcement Agency and the Federal District Attorney's Office. So we knew, at that time, that he was still subject to an intense federal investigation. By what council? In July of what year? 2011. And that's why we refused to reinstate him April 1, 2011, because he was still the subject of a federal investigation. But doesn't that just establish, at the most, that you knew in July? That doesn't establish that you knew April 1 when he was due to be reinstated. We're talking about a federal investigation from drug enforcement. We're talking about a rural community of 7,400. Not much goes on in town that nobody knows about. And the fact that following in October of 2011, the union stipulated in a pre-hearing memo that reinstatement could jeopardize the hospital's license, one could infer that there was certain information that was being divulged to council that would not jeopardize the federal investigation. Look, dealing with the feds as a hospital during a major federal investigation, it's kind of like dating a piranha. You could get bit. So on one hand, the hospital could not allow the reinstatement. On the other hand, we could not exactly divulge openly all that we were aware of because we were dealing with the federal government's investigation, which we did not want to interfere with. Did you present that argument to the board? I presented it in my exceptions, saying basically, you know, it is what it is. You don't need, you know, if there's a duck in a room, you know, if it walks like a duck, smells like a duck, sounds like a duck, you don't need to tell me it's a duck. We were in the middle of a federal investigation, DEA plus the U.S. Department of Justice. We were somewhat restricted. But in my arguments filed with the Labor Relations Board, I did argue that we were in the middle, and that's where the interpretation of that provision comes into play. We are not repudiating the agreement. We had an agreement. We are just disputing a term, a provision of that agreement, unable to return to work on April 1st. It was our interpretation that if he was still subject to a federal investigation, we could not return him to work. And what prevented that? This is where maybe the problem stems from the language in the agreement that you agreed to. Should he fail or be unable to return to work at that time? So in essence, what prevented him from returning to work? What prevented him from returning to work was he was still subject of an ongoing federal investigation from Drug Enforcement as well as U.S. Attorney's Office. I understand that you're describing what was happening in the background, but what prevented him from being able to work? It's not in the record. We were told not to reinstate him by the feds. You asked, I have to tell you. Well, that was a request made that apparently you honored. Yes, Your Honor. Well, let me ask you this. I'm not going to lie. Assume he is under a federal investigation at the time, and I think he was, and the hospital did know of it. Does that make him unable to return to work? I mean, is there a law to support that? Proposition? Or is that just the hospital's position? That's the hospital's position. Which I'm not saying is unreasonable. I'm just wondering if there's case law or statutory law or regulatory law that supports the hospital's position that if under federal investigation he would be not qualified or unable to work. No, it's the hospital's position. Is that position contrary to any existing law? Would the hospital's position subject him to some kind of repercussion or liability for not allowing him to work because a federal investigation in and of itself is not enough to preclude him from working? Other than the union's right to file a grievance or the union's right to file an unfair labor practice charge, I'm not aware of any. Okay, I just want to make sure, when you began your argument, you said in July 2011 you filed an answer wherein you indicated the hospital was aware there was a federal investigation ongoing. Correct. What answer was that? What document are you talking about? That was an answer to the complaint that was filed by the State Liberations Board. Okay. Subsequent to that, prior to hearing, we filed a pre-hearing memoranda where the union and the hospital jointly filed stipulations. One of those stipulations in October 2011 was that both parties recognized reinstatement could jeopardize our continued license to operate a hospital. Could you explain that? What evidence is there in the record that supports the suggestion that the license would have been jeopardized? I think you could infer that by the party stipulations and the fact that a federal investigation was still ongoing. Can you explain that? Because I'm not sure what inference is derived from that or stems from that, or I should say flows from that. I mean, what is it? Can you tell us, is there a special provision in hospital licensing regulations that indicate that if you have an employee who is under a certain type of investigation that it's going to impact on licensing? You keep on asking those questions. Okay. Are you saying there's something outside the record? If I have a federal investigator come to me and tell me that if I do something, it could be considered intentional interference in a federal investigation, I can assure you I'm going to be hesitant to go do that. Is there any reason why some of these things aren't in the record? At the time, yes. My second argument is with regards to public policy. Should you find the State Labor Relations Board did not err, should you find that we erred in not reinstating them, then I would venture to position that there's strong public policy that mitigates against enforcement of a reasonable order. If I can bring your attention to something that this very appellate court said back in 1998, 16 years ago, when I had the honor and privilege of representing the County of DeWitt. This court held even if the arbitrator makes his award within the scope of his authority and the award is based on the arbitrator's interpretation of the agreement, we will vacate that award if it is repugnant to established norms of public policy. Sixteen years ago, I was here before you with that case, where an employee at a nursing home, a DeWitt County nursing home, slapped a senior citizen resident. One slap, one disciplinary infraction in that employee's record, and the arbitrator held that did not rise to the level of termination. Suspension with reinstatement was ordered and this court vacated that, basically saying there's strong public policy against allowing even one slap. Now, comparing that to this case, I think this case is more important, because you're talking about a small rural hospital servicing central Illinois. There's 7,400 people in town. That's it. If you're going to be providing health care services to the general public, that public has the right to know that you're not employing or reinstating somebody that stole drugs from you. That public, as well as the employer, has a right to expect that employee not to steal drugs from them. Well, counsel, isn't it different in that in this situation, we're dealing with someone who's under investigation, someone who's had the state charges dismissed and is under federal investigation versus someone who's obviously committed a crime, slapping someone at a nursing home. It seems much more resolved and definite than under investigation. I mean, if you think about that and we say anyone who's under investigation, this taints our reputation, the trust the public has. I mean, is that where we're going? Well, at that time, property from John Warner Hospital was found on August 24th in his residence during the exercise of the search warrant. So at that time, we knew he had our property. We did not at that time know the full extent. We did not know that it was going on for five years. You knew that your property had been found in his residence? Yes. And that charges filed related to what was found in his residence had been completely dismissed? Had been dismissed on the 29th of March. Right. And, of course, the reinstatement date was April 1st. Correct. Nonetheless, public policy. And I know that we're talking about just a 24-month period because on March 28, 2013, he submitted himself for six months in prison. So we know that we're not – he's now going back a month. Right. Okay, we know that. He was unable after 28. But nonetheless, it's just not right to force an employee or – for whatever reason. Maybe we caught him between a hard place and a rock and had to decide whether or not to face what I'm facing right here in front of you respectfully versus what could have been the alternative. Okay? It's just not right to give somebody that stole for five years from the hospital a check for $56,000. It's just not right. I mean, I'm old school. I mean, they might have goofed up, but they'll make him pay for it. I mean, it's just not right. I'm sympathetic to the old school argument, but didn't kind of the hospital agree to that? They reached this agreement, which I guess it's disputable whether it was ambiguous, and used the term unable to return to work. So that's kind of why we're here today, isn't it? Because the hospital made an agreement which is less than clear or, from their perspective, is pretty clear that it works against the hospital's position. Well, it's our position, respectfully, that that provision, unable to return to work, is subject to interpretation. It's subject to the party's intent. Obviously, we had a meeting of the minds to have an agreement. I mean, after that agreement, he was put on administrative leave without pay. But we didn't have a meeting of the minds as to what specifically had to occur by April 1st in order for us to reinstate him. Plus, that agreement doesn't even talk about reinstatement. It just talks about termination. So there's no requirement to reinstate on April 1st. So that opens up a lot of questions as to what were the party's intent when they signed off on that agreement on April 1st. And a better jurisdiction for that would be the circuit court in a specific performance action, not before the Labor Relations Court. If you have nothing further, you'll have rebuttal. Ms. Quinn, are you going first? Okay, thank you. Will you please the court? The question in this case is what did the parties intend on September 22nd, 2010 when they voluntarily reached a settlement of the grievance? Given what the record shows the parties knew in their conduct, the board found that there was a meeting of the minds about what being unable meant at that time. It meant Short might go to jail or he might be free of the charges. Being unable did not mean you're under investigation. And the hospital has essentially admitted that that's what its understanding of being unable to come back to work meant. Short was going to be locked up. The hospital admitted that in their argument. They even admitted it on page 16 of their brief, where they talk about when Short went to surrender himself for the federal charges, he came at that date unable to come back to work. So that's what it meant, and any talk of ambiguity is kind of an after-the-fact distraction. Wait a minute, you're saying the hospital admits that just being under investigation... No, no. The hospital admits that its understanding of its agreement about what the term being unable to come back to work meant, meant being locked up. Really? Yeah. Why would they take that position? It's inconsistent with the position they took when they terminated him before the charges were ever filed. He was only under investigation then. Why the hospital agreed to what it agreed to... I mean, in essence, the hospital is here asking this court to serve as a kind of a superhuman resources division to relieve it of the consequences of the settlement that it entered into voluntarily and later, based on whatever it discovered, came to believe was perhaps ill-advised. And this court should decline that invitation. Excuse me. You were going to point to somewhere in the record that the evidence is that understanding? Page 16 of their brief. They talk about short surrender. It's the end of that first whole paragraph where they talk about Martin Short surrendering himself finally to serve time on the federal charges that he was finally convicted of, and the hospital says, as of that date, he was unable to come back to work. But you still shouldn't put our agreement against us. So any talk of ambiguity in the term unable is kind of contradicted by what they say themselves. To the extent that they meant something other than Short being locked up, they knew how to... these are not lightweights representing the hospital. This was their director of human resources, and this was their attorney who has served them for over 25 years and who has negotiated, you know, dealt with labor and municipal issues on behalf of other municipalities as well. These people are serious business people, and if they had meant to include a federal investigation as part of the terms of the agreement, they knew how to draft language that would cover that. And if you're mindful of, okay, we don't want to reveal anything confidential to the extent we know it, you could say, well, he can return to work unless he's... charges haven't been dismissed or he's under investigation by any law enforcement authority anywhere, whether or not charges have been filed. People know that words matter. Negotiators, attorneys know that words matter. And they know how to draft language to cover various scenarios, if that's what they intend to do. And, you know, what they could have done on April 1st was bring Short back to work and then say, you know, we've learned some other stuff in the meantime. You're not just a drug dealer, you're a thief too. And they could have said, welcome back, Mr. Short, now you're fired. A whole separate disciplinary proceeding based on the new information they had learned. Then they would have complied with their agreement, and we probably wouldn't even be here today. What they couldn't do is the thing that they did do, which is to repudiate their agreement and then try to backpedal and say that, you know, the new information was somehow included with what they really meant back on September 22nd of 2010. Sound public policy favors the orderly settlement of grievances, and you can find it in the Illinois Public Labor Act, where, for example, its definition of a labor organization is an organization that's empowered to, or exists for the purpose, among other purposes, of settling grievances. And the act also includes as an unfair labor practice any attempt to prevent the voluntary settlement of grievances. Illinois law takes that seriously. And, you know, the same public policy can be found in previous decisions of this court as well. The refusal to abide by a negotiated settlement is itself an assault on the bargaining process. Nothing in this agreement allowed the hospital to opt out of it at its discretion, based on the information it apparently learned way after the fact. And if the court has no questions for me, I would stand on our brief and urge the court to refer me to this decision. Okay, thank you. Ms. Arbon. Okay, please, the court. I'm Melissa Arbon, I represent AFSCME. I want to respond to some statements of counsel for the hospital. The hospital referred to the answer of the hospital to the unfavorable practice complaint. And the answer was filed July 27, 2011, which is 10 months after the settlement agreement was negotiated. And the hospital, and this is on page C18 of the record, in paragraph 2H, said that at the time it entered into the grievance settlement, respondent's intent was to allow for a full reinstatement of said employee upon the complete removal of any all charges and our criminal investigations. Well, whether a settlement agreement was entered into and what its terms are is determined by the objective intent of both parties, the objective conduct of the parties, not by one party's undisclosed subjective intent that's not disclosed to the other party. There is absolutely no evidence in the record that either before or after the settlement that the hospital ever told AFSCME that the grievance was under federal investigation, which may have, you know, affected how AFSCME proceeded with the case also. But there was a stipulation, and I'm curious about what your impression is of what this means, where the licensure to provide medical hospital services to the community may be in jeopardy should it reinstate short. So, you know, what was meant by that? May be in jeopardy. In what way and what would it depend on? I think at most it was a concession by AFSCME that to that extent may, for purposes of submitting a stipulated record to the board, because in lieu of hearing the parties agreed to stipulate a record, and so all AFSCME was conceding was that that's the most the hospital's evidence could have established, was to put on a witness to say it may, which is very vague and doesn't show that it would, and doesn't allow for any finding that it would. Is there anything in the record that would provide further clarification of that? No, that's the complete extent of the evidence in the record on any effect on the licensure, is that one sentence, which basically was agreed on in lieu of hospitals putting on a witness to say the same thing, which our position is that really shows nothing, because under this court's, you know, the Supreme and Appellate Court public policy decisions, there has to be a clear and well-defined public policy that's dominant and would be clearly violated, and in the cases it's by an arbitration award, and here, you know, general notions of public health and safety and the importance of, you know, hospitals is insufficient. I mean, this employee wasn't providing medical care at the hospital. He was a janitor, and absent that one sentence made, there's no evidence that his reinstatement would have, in fact, affected anything. And so the unit agreed to it because of its view that that's the most that the evidence would have shown. So there's no evidence that the hospital told AFSCME there was an investigation. The settlement agreement is read as, you know, the objective conduct of the parties was they both knew that there was this pending state investigation. That's all AFSCME knew about. And when he wasn't in jail, you know, and unable to return to work, he was able to return to work and should have been returned. So that's AFSCME's position is that unable to return to work means or meant that he had to be in jail? Either in jail or, I mean, I think the assumption was that the state proceedings, there was enough time being allowed for the state proceedings to conclude. But the state proceedings had not. Well, they were concluded as of the date of the effective date of return to work. Why do you say that? Because they were dismissed. Without prejudice. Without prejudice. What does that mean? Well, without prejudice means he was able to reinstate. Correct. But they didn't exist, and he wasn't in jail. Well. So it allowed time for the... Counsel argued DeWitt's a small county, Clinton's a small town, one hospital. He said he's from the old school. I'm a former state's attorney of a small county myself in Logan County. I'm thinking about if I filed charges. We have one hospital in Logan County and that's Lincoln. In state court, and then I dismiss them without prejudice. I think his, what he was implying is that there are things that people know in small communities. And it defies logic to me to think that if I had done that as Logan County State's Attorney, that the hospital, someone from the hospital, maybe many people from the hospital, would have said, hey, what in the heck is going on here? We've got these serious charges, you've dismissed them without prejudice. What are you doing, why did you do that, and what does that mean? Now is it too much for me to infer that perhaps the hospital understood why the state's attorney dismissed those charges without prejudice? But the settlement agreement they entered into said if he's unable to return to work. He's incarcerated and unable to return to work. The hospital didn't have to enter into the settlement. That's what you said a minute ago. You said that it was finished from the state's perspective. The case was over. I'm suggesting to you it wasn't. Well, I mean, what the hospitals say now is it was dismissed to allow the federal investigation to continue. But at the time, the agreement was negotiated, which is, you know, both parties knew, or certainly all the union knew, so all that the objective conduct of both parties together showed was that they knew that there were federal and state, rather, investigation. And either he would be proceeding and he'd be in jail or he wouldn't be. And as of the date of the return to work, he was able to go back to work. Even if the state charges weren't dismissed, he'd be able to return to work. In your brief, you say once the state charges were dismissed, there was an impediment to Schwartz returning to work. I mean, that implies that the state charges, while they were pending, were an impediment to him returning to work. Well, I think the reason there was an agreement to leave him on administrative leave, as opposed to put him back to work right away, was because of the pendency of the state charges. But the hospital could have chosen to rely on the merits of the underlying facts and said, he was found to have drugs, he was found to have possible property, we're not reinstating him, and forced the union to choose whether to proceed with the grievance arbitration or to withdraw the grievance. The hospital didn't have to settle the grievance. It could have said, we want to prove the facts. If you want to pursue it, then we'll go before an arbitrator and we'll show just cause under the contract, which is required for discharge. And instead, the hospital entered into a settlement agreement. And in return for that, AFSCME withdrew its grievance in return for the settlement. And part of the settlement was they took out of his personnel file all references to the reasons for the discharge, put him on a leave as opposed to termination, and said, you know, he's not able to come back to work on this date. You know, then he's terminated. I'm not familiar enough with the process. So, if this is, if the answer is obvious, forgive me. At the time the grievance settlement agreement was entered into, is that a point where the hospital could have just said, no, he's terminated. We have enough evidence. We're not going this route. Right. So what happened is the hospital announced that they wanted to terminate him. AFSCME filed a grievance on behalf of Short. And it proceeded, second step it was denied, and the hospital said it was denied because he was found to have, he was arrested, found to have drugs. AFSCME pursued it to the third step. And at that meeting, they entered into a settlement agreement. And the settlement agreement was entered into about two days after the state charges against him were filed. So both parties knew at that point that state charges, criminal charges had been filed. So the hospital had the option of denying the grievance at step three and saying, no, our position is he's properly discharged for just cause, as the agreement allows us to do. And if they did that, AFSCME could have either agreed, we're not going to win this case at arbitration and withdrawn the grievance, or else said, we want to have this decided by an arbitrator whether or not you can show just cause for discharge, because even though he's arrested, he hasn't been proven convicted. And they could have, you know, and so the hospital could have denied, continued to deny the grievance and forced AFSCME to choose whether to pursue the grievance to a neutral arbitrator or not. But they didn't do that. They entered into this agreement saying, okay, we'll agree to keep him on administrative leave for a few months. And if he's unable to return to work a few months down the line, then he's terminated at that point. And so they entered into a settlement agreement. The public policy under the labor law favors collectively bargained settlement agreements because the alternative would be, if there were no settlements, a union would have to take many more cases to arbitration, which would be inefficient and much more costly to both the employers and the unions. And so if a union can't rely on a negotiated settlement agreement to keep everything upheld, then there's no incentive to enter into them if it's going to have to then pursue litigation every time an employee says, we changed our mind. We're sorry we entered into this agreement. We regret it. You know, we shouldn't have done it. We're not complying. And the union has to sue. It would be cheaper to go to arbitration than have to pursue litigation to enforce it. And so there's a strong public policy favoring enforcing that. And there was nothing as of the date of return to work that prevented him from returning. As far as public policy, why it would be sound public policy for an employer, as Mr. Sikwinski argued, to make back pay with interest to an employee who has committed several violations of law, including stealing from the employer. What's the sound public policy behind this court endorsing that outcome? Well, it would be analogous to the public policy behind furthering the criminal justice system by suppressing unlawful searches and not allowing in evidence of an illegal search into a criminal case, even though that evidence might prove guilt. And so you're upholding the criminal process and the right of people to be free from unconstitutional searches and seizures. And so here you're upholding the public policy favoring collective bargain settlement agreements, even though this employer in this particular case is sorry that it entered into an agreement that it didn't and wished it had just discharged him and stood on its ground and said, no, we think we have cause. So you're upholding the collective bargaining process and the public policy under the Illinois Public Labor Relations Act in favor of settlement agreements, which is a type of collective bargaining agreement. Well, you know, I understand your argument. I'm thinking if the media, public in general, took a look at this case and said, you know, we've got this person here who we now know has committed these crimes, stolen from this hospital, who was charged by the state because the feds got involved. The state dismissed their case and the feds took over the case. And eventually he pleads guilty and now this court says that the hospital has to pay him with interest in spite of all those facts. And that's the, as the public would see it, good policy would trump the policy that you're talking about with regard to how you can do with labor negotiations. That's basically your argument and apparently that's what the attorney general for the state of Illinois also believes. Right. So are we leaving out of that analysis the fact that the hospital voluntarily entered into an agreement and basically made their bed in this situation? Right. I think that's correct, which is one thing that distinguishes this case from it. But what you're saying, what we know now doesn't make any difference. What we learned later doesn't make any difference. Even though it may be true, it doesn't matter because the public policy of putting this person back would trumps it because of what was known at that time. And that's sound public policy for the state. That's correct. And in this case we're talking about back pay to honor a settlement agreement, which there's no basis to overturn as of the time it was made. And it didn't, the hospital had the ability to enter into it. And I mean again, I mean going again to the criminal context, there may be cases where people, they were paid. So even if the hospital's hands were tied as counsel is represented because of the federal government and the state government and the prosecutorial authorities working on this, that doesn't make a bit of difference? Well, there's nothing in the record, and I haven't even heard counsel say that the federal government told them they had to settle the case and enter into the settlement agreement. He said today that they told him not to bring him back later on, but to terminate it. We're doing a lot of speculating about, and I don't doubt what counsel has represented to the court at all, but isn't the bottom line that we have to go with what's on the record? And if we want to speculate, in my opinion, I think the hospital perhaps was let down. They thought things would be worked out before they were worked out and things didn't happen as quickly as they thought they would happen. And then as counsel indicated, they got stuck between a rock and a hard place. Does that really change our analysis based on the record before us? The unit submits that it doesn't change it, that it's the agreement that was entered into at the time and not what the hospital reprised based on subsequent events. So we request that this court affirm the boy's decision. Thank you. I'm sorry. I forgot what I was doing here. Rebuttal, please. Well, shame on me for trying to work with the union to work out a grievance settlement. But I want to highlight one fact. We are not repudiating the grievance settlement. We are disputing, not repudiating, we're disputing a particular term. And back April 1, 2011, he was supposed to be reinstated according to the union, but on July 27, 2011, we stated that. The reason why we didn't do that was because that would be the subject of a criminal federal investigation. So that's out there. And I won't bring up how many years I've been doing this if she stops bringing it up. All too long. But I just wanted to highlight the fact that public policy, we're not repudiating the agreement. So the public policy in favor of collective bargaining agreements, I don't see that comes into play here. We're disputing a term and the more appropriate form to dispute that term would be in a circuit court specific performance action. And I would speculate they didn't do it because they knew in DeWitt County Circuit Court you know where that's going to go. So this might have been the only avenue available to them. But it admits to the fact that we're disputing a term, not an agreement. And that's it. Thank you. Thanks to all of you. The case is submitted. The court stands in recess.